1  Michael W. Sobol (State Bar No. 194857)
   Nicole D. Reynolds (State Bar No. 246255)
2  LIEFF CABRASER HEIMANN & BERNSTEIN LLP
   275 Battery Street, 29th Floor
3  San Francisco, CA 94111
   Telephone: (415) 956-1000
4  E-mail: msobol@lchb.com
   nreynolds@lchb.com
5
   Daniel M. Hattis (State Bar No. 232141)
6  HATTIS LAW
   1134 Crane Street, Suite 216
7  Menlo Park, CA 94025
   Telephone: (650) 980-1990
8  E-mail: dan@hattislaw.com

9  *Attorneys for Plaintiffs*

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13          **CV  13  5296**

14  MONA GANDHI, MARISHA                    Case No. _____
    JOHNSTON, and MARSHALL TIETJE,
15  individually and on behalf of all others    **CLASS ACTION COMPLAINT**
    similarly situated,
16                                              **JURY TRIAL DEMANDED**
                    Plaintiffs,
17
18  v.

19  TRACFONE WIRELESS, INC.

20                  Defendant.

21

22          Plaintiffs, individually and on behalf of all others similarly situated, allege on personal

23  knowledge, investigation of their counsel, and on information and belief as follows:

24                          **NATURE OF THE ACTION**

25          1.      This proposed class action alleges that TracFone Wireless, Inc. ("TracFone" or

26  "Defendant") falsely advertises Net10 cellular phone plans as providing "unlimited" data

27  service, when in fact the Net10 subscribers in the class have had their supposed "unlimited" data

28  service terminated or "throttled."

CLASS ACTION COMPLAINT

2. Defendant founded the Net10 brand in 2004, and since that time has continuously advertised "unlimited" service plans, thereby becoming one of the largest prepaid phone brands in the United States.

3. Defendant prominently advertises that Net10 wireless plans include "unlimited" data, but fails to disclose that Defendant terminates or "throttles" (*i.e.* reduces the speed of) subscribers' access to data. On information and belief, Defendant terminates or throttles data access when subscribers near or exceed Defendant's internally established, but undisclosed, data usage limits, or when Defendant's wireless network partners (*e.g.* AT&T) direct Defendant to do so even where subscribers' usage is below Defendant's internal, undisclosed limits in order to limit the strain on Defendant's wireless partners' networks.

4. In response to complaints from the members of the proposed Class, Defendant routinely blames customers for "misusing" Net10 cellular data service, but fails to explain how customers allegedly misused Net10 cellular data service or the reasons that Defendant has terminated or throttled customers' data access.

5. After Defendant terminates or throttles data service to Net10's "unlimited" data plan customers, Defendant engages in the practice of failing to restore data access or regular data speeds unless and until subscribers' current prepaid data plans expire *and* subscribers purchase new Net10 service plans.

6. As a result of Defendant's material misrepresentations, bad faith, and unfair and unlawful conduct, Plaintiffs and Class members have suffered damages, including, without limitation, payment for Net10 "unlimited" data service plans, payment for Net10 branded and locked smartphones (which cannot be used with other wireless carriers), or payment for Net10 SIM cards.

7. On behalf of themselves and the Class, Plaintiffs bring this lawsuit against Defendant for breach of contract; breach of the covenant of good faith and fair dealing; unconscionability; unjust enrichment; and violation of California's Unfair Competition Law and California's Consumer Legal Remedies Act.

## PARTIES

8.      Plaintiff Marisha Johnston is an individual residing in Hollister, California.

9.      Plaintiff Mona Gandhi is an individual residing in Hayward, California.

10.     Plaintiff Marshall Tietje is an individual residing in Sugarloaf, California.

11.     Defendant TracFone Wireless, Inc. is a Delaware corporation and is headquartered in Miami, Florida. TracFone is the fifth largest wireless carrier in the United States, with over 23 million subscribers as of July 2013. TracFone holds multiple agreements with the United States' largest wireless telecommunications companies, including Verizon, AT&T, Sprint, and T-Mobile, to use their networks to provide wireless service.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) as the amount in controversy exceeds $5,000,000 among the proposed nationwide Class, believed to number at least in the tens of thousands, who are entitled to damages in the amount of the purchase price of Net10 "unlimited" service plans, compatible phones, and SIM cards.

13.     This Court has personal jurisdiction over Defendant TracFone because Defendant is authorized to do business and regularly conducts business in California, and has marketed, sold, and issued Net10 service plans, phones, and SIM cards in California. Defendant has conducted business in California with certain of the Plaintiffs. Defendant therefore has sufficient minimum contacts with this state to render the exercise of jurisdiction by this Court permissible.

14.     Venue is proper under 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.      Defendant Falsely Advertises Net10 Wireless Phone Plans as Providing "Unlimited" Data.

15.     Defendant TracFone created the Net10 Wireless brand in 2004, and since then it has become one of the largest prepaid phone brands in the United States.

- 3 -                                CLASS ACTION COMPLAINT

1140516.2

16.     Defendant markets and sells Net10 branded prepaid wireless service plans, phones, and SIM cards. Net10 products and plans can be purchased directly from Net10 or at over 80,000 retail locations across the United States, including Walmart, Target, BestBuy, RadioShack, and leading and independent supermarkets and drugstores.

17.     Defendant offer two types of plans: limited plans, which include specified numbers of minutes which can be used for talk or data on basic or feature phones; and 30-day "unlimited" plans, which can be used with smartphones and which Defendant advertises as including "unlimited" data. "Unlimited" plans include a 30-day individual plan for $50, and a 30-day international plan for $65. Defendant also offers unlimited "Family Plans," which are identical to the unlimited individual plan but include a $10 discount for each additional phone added to the group, up to a maximum of four phones. Customers are promised a $5 discount if they sign up for the Net10 "Auto-Refill" program. Below is a screenshot of Net10's offered plans, taken from Net10's website on September 25, 2013:

- 4 -

18.     Smartphones comprise over 70 percent of the Net10 branded and locked phones currently offered for sale by Net10. In January 2013, Defendant began selling Net10 branded iPhones, in addition to its Android smartphone lineup.

19.     On February 9, 2012, Defendant promoted Net10's "Bring Your Own Phone" program as a new way for consumers to sign up for Net10's "unlimited" data plans. Through this program, Defendant sells Net10 SIM cards to enable the "unlimited" plans on unlocked AT&T or T-Mobile compatible GSM smartphones. On April 4, 2013, Defendant expanded this program such that unlocked Verizon compatible CDMA smartphones may be used with the Net10 "unlimited" plans without a Net10 SIM card.

20.     Defendant continues to aggressively and consistently promote the supposed "unlimited" data plans in order to capture the burgeoning smartphone market. Defendant's advertising and packaging of Net10 phones, SIM cards, and data plans prominently feature the word "unlimited." Below are examples of Defendant's marketing for Net10's "unlimited" plans:



21.     Defendant's widespread marketing for Net10's "unlimited" data plans induced millions of new smartphone users to subscribe to the plans and buy Net10 phones and SIM cards.

22.     Defendant's promise of "unlimited" data is material to consumers.

23.     Upon information and belief, the networks accessed by Net10's data plans (AT&T, Verizon, Sprint and T-Mobile) have complained to Defendant about the ever-increasing strain being placed on their respective networks by growing numbers of Net10 "unlimited" data plan subscribers.

## B.     Defendant Regularly Terminates or Throttles "Unlimited" Subscribers' Access to Data.

24.     To control network data usage and costs, Defendant implements monthly data usage limits, which Defendant fails to disclose to Net10's "unlimited" data plan subscribers. A former TracFone employee stated that the monthly data cap in 2012 was between 2 GB – 3 GB, having been reduced from a prior 5 GB limit at the behest of Defendant's network carrier partners.[1]  Defendant actively conceals these limits from Net10's "unlimited" data customers.

25.     Upon information and belief, Defendant had a contract dispute with AT&T regarding the increased strain and cost to AT&T's network, which led to Net10's adoption of a policy, in or around March 2013, of imposing a monthly hard cap of 1.5 GB of data for Net10 subscribers using AT&T compatible SIM cards, after which subscribers' data would be automatically terminated.[2]

26.     Defendant admitted to the 1.5 GB cap in a hard-to-find blog entry on the Net 10 website.[3]  In March 2013, Defendant posted new Terms and Conditions of Service on the Net10 website stating, for the first time, that there was a hard 1.5 GB data usage cap for Net10 customers who purchased "unlimited" data plans for their Net10 AT&T compatible SIM cards.

---

[1] Discussion on XDADEVELOPERS.COM, *Have questions for StraightTalk/Net10/Tracfone?* (*available at* http://forum.xda-developers.com/showthread.php?t=1641966).

[2] Humberto Saabedra, *Net10 to Cap AT&T SIM Customers to 1.5 GB Starting March 1st*, PHONENEWS.COM, February 28, 2013 (*available at* http://www.phonenews.com/net10-to-cap-att-sim-customers-to-1-5gb-starting-march-1st-22480/)

[3] http://www.net10blog.com/2013/02/what-can-you-do-with-16-gb-of-data.html

1140516.2                                          - 6 -                              CLASS ACTION COMPLAINT

1

27. Defendant failed to notify existing AT&T SIM card customers of the 1.5 GB data usage cap. Moreover, Defendant continues to prominently advertise and sell the plan as "unlimited."

28. On or about August 8, 2013, Defendant claimed to have removed the 1.5 GB cap for AT&T SIM card customers.[4]

29. On September 27, 2013, Defendant posted further revised Terms and Conditions of Service on the Net10 website stating, for the first time, that "unlimited" data plans for all Net10 phones and SIM cards have a monthly data usage cap of 2.5 GB, after which data will be throttled to "2G speeds," regardless of which underlying carrier network (*i.e.*, AT&T, Verizon, Sprint, or T-Mobile) is utilized to provide service.

30. Defendant failed to notify its existing subscribers of the 2.5 GB data usage cap and corresponding throttling. Moreover, Defendant continues to prominently advertise and sell the data plans as "unlimited."

31. When customers exceed Defendant's data usage limits, Defendant typically throttles or terminates customer data access without any notice or warning, as Defendant did in the case of all three plaintiffs. In other instances, Defendant first throttles customer data to virtually unusable speeds before terminating the data access altogether.

32. When customers contact Net10 to complain about being cut off, Net10 blames the customers for engaging in "unauthorized uses" set forth in the Net10 Terms and Conditions. But these Terms and Conditions are not reasonably disclosed or agreed to by customers, and are also riddled with vague, confusing, contradictory, and unconscionable provisions. Defendant fails to disclose its data usage limits to customers or explain the reasons why their data access was terminated or throttled.

33. Customers contacting Defendant about their data access being terminated or throttled are often transferred to a recorded message on Defendant's "High Data Usage Hotline"

---

[4] Humberto Saabedra, *Net10 Removes AT&T Data Caps And Goes Bank To Unlimited?*, PHONENEWS.COM, August 8, 2013 (*available at* http://www.phonenews.com/net10-removes-att-data-caps-and-goes-back-to-unlimited-23238/)

- 7 -                              CLASS ACTION COMPLAINT

that recites to customers that their data service may have been suspended or reduced "due to violation of our Terms and Conditions" and that "our customer care representatives cannot override this policy to restore" data access. The message then suggests "tips" to reduce data usage such as syncing emails no more than once an hour, refraining from browsing regular internet websites (as opposed to "mobile friendly" websites), and downloading a data usage app to "better understand and manage your monthly data plan."

34. Prior to September 27, 2013, the "High Data Usage Hotline" message did not state or refer to the existence of a data cap or limit. On or about September 27, 2013, Defendant updated the High Data Usage Hotline message to state, for the first time, that the "unlimited" data plans have a 2.5 GB data usage "threshold," after which data is throttled to "2G speed."[5]

35. Even in the few instances when a customer is fortunate enough to speak to or "chat" via the internet with a live customer service representative, Defendant refuses to provide a clear answer as to why any particular customer's data access was terminated or throttled. In response to one customer's question posted on the Net10 Facebook page on July 17, 2013 asking why his "unlimited data" was cutoff, a Net10 representative responded "Your data will be suspended if you have exceeded the limit for mobile browsing" without saying what the "limit" is.

36. Defendant's refusal to explain under what circumstances Defendant will terminate or throttle Net10 "unlimited" plan customers' data access makes the practice all the more unclear and deceptive to consumers. Customers report that Defendant has terminated their data access after they used as little as 200 megabytes in a month.[6]

37. Upon information and belief, Defendant also terminates customers' data access at the behest of Defendant's wireless network partners when a particular cell tower is at or near data capacity, regardless of whether that customer's data usage has exceeded Defendant's data usage limits. Upon information and belief, Defendant's network partners such as AT&T are

---

[5] "High Data Usage Hotline" recorded message, reachable at 866.793.0474.
[6] *See* customer complaint posted in user comments to Net10 commercial at http://www.youtube.com/watch?v=H0V4i-mvAH4&lc=VdFqO9rG-9ioOELYabLaI_ag81GKxUvbZcpQm8gZhYc (posted February 2013)

1140516.2                                    - 8 -                          CLASS ACTION COMPLAINT

1    concerned that Net10 customers' data usage on their networks may negatively impact their

2    ability to provide their own direct customers with service, and thus require Defendant to restrict

3    the data usage of Net10 customers.  TracFone Executive Resolution Specialist, Juanita

4    Woodside, said the following to a customer in response to his FCC and BBB complaints:

5    "Tracfone... doesn't track your usage, AT&T or T-Mobile does.  When on a given cell phone

6    tower (AT&T or T-Mobile), and you use a lot of data, this affects other subscribers."[7]

7

8    ## C.   Defendant Unfairly and Unlawfully Blames Customers for Purportedly Violating Never-Disclosed and Unconscionable "Terms and Conditions."

9    38.    When customers contact Defendant to complain about their data access having

10   been restricted, Defendant typically tells customers that their "unlimited" data access has been

11   terminated or throttled because they allegedly violated the Net10 "Terms and Conditions" that

12   Defendant purports to apply to Net10 phones, SIM cards, and service plans.  But these terms are

13   never adequately disclosed to consumers and contradict Defendant's prominent and consistent

14   advertisements that Net10 plans are "no contract" plans.  Defendant advertises in its television

15   commercials that there is "no catch" to Net10's "unlimited everything" plans.  One such

16   commercial, titled "What's the Catch?" features a child speaking to the camera: "What's the

17   catch? If I've told you once I've told you a thousand times, with Net10 Wireless there is no

18   catch!"[8]

19   39.    Defendant does not require consumers who purchase Net10 phones, SIM cards,

20   or service plan cards to view the Terms and Conditions before making their purchase.

21   40.    The Terms and Conditions are not referred to and are not available anywhere on

22   websites of major Net10 retailers such as Walmart.com, Target.com, RadioShack.com, and

23   Amazon.com.  On net10wireless.com, the Terms and Conditions are hidden in tiny text in a link

24   at the footer of the website's home page, which a consumer must click to have the Terms and

25   Conditions open in a small window.

26

27

28   [7] http://www.howardforums.com/showthread.php/1765893-A-limit-according-to-Tracfone
     [8] See Net10 commercial at http://www.youtube.com/watch?v=FaOG9_iKhwA

1140516.2                                    - 9 -                         CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

41.    The Terms and Conditions are not provided with the Net10 service plan cards purchased at any of the 80,000 retail locations they are sold.  The front of the service card, in very large white text on blue background, features the word "UNLIMITED" next to "Data, Text, Talk, 411."  Hidden on the back of the card, in tiny text, is a statement that use of the service card is subject to unspecified "Terms and Conditions of Service at net10wireless.com, which are subject to change without prior notice."  Below are photographs of the front and back of the service card:



42.    Defendant does not mention the Terms and Conditions when a customer purchases or activates a Net10 service plan, smartphone, or SIM card over the telephone.

43.    Inside the packaging of Net10 phones and SIM cards, Defendant hides the Terms and Conditions in a shrink-wrapped "Services Guide" booklet.  The cover of the booklet directs customers to "Activate Your SIM Card First" (in the case of SIM cards), or to "Use the Activation Card First" (in the case of phones).  The cover of the booklet does not mention the

existence of the Terms and Conditions, which are buried in the middle of the booklet in tiny text. Below is a photo of the Services Guide booklet:



44.     In March of 2013, Defendant began selling a new SIM card package containing both AT&T and T-Mobile compatible SIM cards, which included a notice in the fine print on the back of the package that "The Net10 30-day Unlimited Plan Card that you add to your phone will indicate unlimited data, however if you choose the AT&T compatible SIM you will be limited to 1.5 GB of data." Defendant also included a slip of paper inside of the package mentioning the 1.5 GB data usage limit for AT&T compatible SIM cards. But, Defendant continued to sell AT&T compatible SIM cards and Net10 branded phones with old packaging, which made no mention of the 1.5 GB limit.  When Defendant updated the Net10 Terms and Conditions on September 27, 2013 to state the 2.5 GB data usage cap for all Net10 branded phones and SIM cards, Defendant failed to update any of its product packaging (*e.g.*, for the phones, SIM cards, or data plan cards) to disclose the purported change.

45.     The Terms and Conditions claim that, by purchasing or activating Net10 phones, SIM cards, or data plans, customers agree to them, despite that fact that consumers purchase and activate their phones, SIM cards, or data plans *prior* to even having an opportunity to view the Terms and Conditions. Moreover, Net10 and its retailers do not allow returns of service cards or SIM cards, such that a consumer who reads and decides to reject the Terms and Conditions is unable to do so.

46.     The Terms and Conditions are illusory in that they purport to allow Defendant to change any of the terms at any time without notice to or consent from Net10 customers: "These Terms and Conditions of Service are subject to change at any time without notice. Any changes to these Terms and Conditions of Service are effective and binding upon you when posted on our websites at NET10.com."

47.     Defendant, via its customer service agents and the "High Data Usage Hotline" recorded message, points to the Terms and Conditions as the reason for terminating or throttling customers' data.

48.     The Terms and Conditions contain confusing and contradictory language about how much data is included in the monthly "unlimited" plans. Up until September 27, 2013, Section 3 stated that the monthly "Unlimited Plan" provides "50,000 minutes (that is more minutes than there are in a month)" which can be applied equally to talk, email, text and web. Contradictorily, Section 18 made no reference to the 50,000 minutes, and instead stated that the "Unlimited Plan" includes unlimited calling, text, and web access.

49.     On March 12, 2013, Defendant modified Section 18 to include a notice that "after March 1, 2013 ... Net10 SIM cards that operate on the AT&T Network on an Unlimited Plan will be limited to 1.5 GB of data per month." Defendant did not update the description of the "Unlimited Plan" in Section 3, which continued to make no mention of a 1.5 GB cap for AT&T compatible SIM cards and continued to state that the "Unlimited Plan" provides 50,000 minutes which can be applied to data usage. Despite Defendant's statements that the 1.5 GB data cap was removed as of August 8, 2013,[9] the Terms and Conditions on the Net10 website continued to state the 1.5 GB limit until the Terms were updated on September 27, 2013.

50.     On September 27, 2013, Defendant modified Sections 3, 18, and 19 to provide, for the first time, that "unlimited" data plans for all Net10 phones and SIM cards have a monthly data usage cap of 2.5 GB, after which data will be throttled to "2G speeds," regardless of which

---

[9] Saabedra, *Net10 Removes AT&T Data Caps And Goes Bank To Unlimited?*, *supra.*

- 12 -

underlying carrier network (*i.e.*, AT&T, Verizon, Sprint, or T-Mobile) is utilized to provide service.

51.     Section 20 of the Terms and Conditions ambiguously prohibits "access to the Internet, intranets, or other data networks except as the device's native applications and capabilities permit." This poorly written provision could arguably be read to encompass the installation and use of any smartphone application not preinstalled on the phone, but such a reading would be extreme and contrary to consumers' reasonable expectations. Section 20 also prohibits "tethering"; *i.e.* connecting one's phone to a computer to share Net10's data connection.

52.     Up until approximately March 12, 2013, Section 20 provided that Net10 service plans may only be used for "Internet browsing through the Net10 Mobile Web Portal" and "Authorized Content Downloads from the Net10 Mobile Web Store." Section 20 explicitly prohibited "uploading, downloading or streaming of audio or video programming or games." But, contradictorily and confusingly, the same section later provided that "downloading legally acquired songs" is an example of a permitted use.

53.     On or about March 12, 2013, Defendant modified Section 20, which now provides that Net10 data plans may only be used for "Internet browsing and ordinary content downloads." Section 20 no longer provides that "uploading, downloading, or streaming of audio or video programming or games" are prohibited uses, but instead forbids "uploading, downloading, or streaming uninterrupted continuous video."

54.     Despite Section 20 purporting to prohibit at least some types of video and music uploading, downloading, or streaming, Defendant publicly promotes and encourages consumers to use their smartphones and data plans to download and stream music and videos. Defendant preloads streaming video apps, such as YouTube, on Net10 branded smartphones. In a post on Net10's blog dated June 3, 2013, Net10 promoted a new Samsung phone as being able to "[d]o two things at once: watch a video as you email or text."[10]

_____

[10] *The Samsung Galaxy S III Has Arrived*, NET10 WIRELESS BLOG, June 13, 2013 (*available at* http://www.net10blog.com).

1
2
3
4
5
6
7

55. Meanwhile, Net10 representatives continue to tell customers that their data access was terminated for reasons Net10 has publicly claimed to not be prohibited uses. As recently as July 13, 2013, a Net10 representative posted on Net10's Facebook page, in response to a customer asking why his data access was terminated, that "unlimited data" is not for audio or video streaming: "Our unlimited plan offers unlimited talk, text and mobile web. All streaming (such as videos, Netflix, YouTube, music, Pandora, online games, large downloads, video chat) has to be done on Wi-Fi and not on NET10's data."

8
9
10
11
12
13
14
15
16
17
18
19
20
21

56. Section 20 also discusses Net10's discretion to terminate or throttle data access. Section 20 purports to allow Net10 to terminate or throttle data service "in order to protect the Carrier's network from harm due to any cause including, without limitation, the excessive and/or improper use of Net10 service" or where Net10 believes a customer "is using the Net10 30 Day Unlimited Plan Service in an unauthorized manner or whose usage, in Net10's sole opinion, adversely impacts the Carrier's network or customer service levels." Despite seemingly putting some limits on its discretion in the above provisions, Section 20 then purports to allow Net10 to terminate data access to anyone, at any time, with no notice, and for any reason or no reason at all: "Net10 may modify or cancel any Service or take corrective action at any time without prior notice and for any reason, including but not limited to your violation of this agreement." Up until approximately March 11, 2013, Section 20 also provided as follows: "Notwithstanding the foregoing, Net10 reserves the right to deny Service, deactivate or cancel existing Service, terminate data connections and/or reduce data throughput speeds, to anyone for any reason at any time, in Net10's sole discretion."

22
23

57. Section 2 states that any "unused service at the time of termination will not be refunded."

24
25

**D.    Defendant Refuses To Restore Subscribers' Data, if Ever, Unless and Until Their Current Data Plans Expire _and_ They Purchase New Data Plans.**

26
27
28

58. Once Defendant terminates or throttles a customer's data access, Defendant will not restore that customer's data service until the customer's current data plan expires _and_ the customer purchases a new data plan. Defendant explained on the High Data Usage Hotline

1140516.2                                          - 14 -                              CLASS ACTION COMPLAINT

recorded message that "customer care representatives cannot override this policy to restore your service to its original data speed. Adding a plan prior to your service end date also will not restore your original data speed." Even after waiting until their plan has expired and paying for a new data plan, many customers find that their data access remains restricted in the new data plan period.[11]

**E.    Defendant's Practices are Unfair and Likely to Mislead Consumers.**

59.    Reasonable consumers are likely to be misled by Defendant's promise of "unlimited" data, particularly in combination with Defendant's advertisements that encourage customers to use Net10 smartphones and data plans in typical ways such as browsing the internet, streaming or downloading music and videos, running apps, and using GPS navigation.

60.    Once customers discover the truth about Defendant's "unlimited" plans, customers are outraged by Defendant's lies and bad faith practices. Angry customers have flooded Net10's Facebook page, turning it into a virtual complaint board. Net10's official online forum, net10forum.com, is also full of complaints from frustrated customers whose data access has been terminated or throttled. Many more customers have posted complaints on consumer websites such as Consumeraffairs.com, Boycottowl.com, Howardforums.com, Pissedconsumer.com, and Ripoffreport.com, or in the comments to Net10 video advertisements posted on YouTube. The following are examples of typical complaints:

"BIG SCAM! They said I was supposed to have unlimited Internet and I have been without it for at least a week. They even took my money out of my account three days ago and still have not connected my Internet! Every time I call customer service they transfer me to a recording then I get disconnected. I will surely be canceling my service with these scam artist!"[12]

"On the 7th of jan, I was told ... the only way I could get my data back was to buy a new card! I spent $50.00 had the card put on my account on the 7th. 2 days later, that being today guess what? my data is off again! in the 2 days I used 195mbs of data. I've never heard of unlimited data being less then 200 mbs."[13]

---

[11] *E.g., see* customer complaints at https://www.facebook.com/NET10Wireless (posted June 6, 2013) and https://www.net10forum.com/viewtopic.php?f=5774&t=201181&start=10#p467601 (posted June 4, 2013)

[12] https://www.facebook.com/NET10Wireless (posted June 6, 2013)

[13] Comment by Gary Tittle to Net10 commercial at http://www.youtube.com/watch?v=H0V4i-

1140516.2                                    - 15 -                    CLASS ACTION COMPLAINT

"I called in yesterday and they said my data was suspended because of extreme usage? They said I went over 1.5 GB , that is not extreme. I only purchased net10 because it said unlimited Data + Text + Calling on the package at Walmart."[14]

"I have filed a complaint with the FCC and the Better Business Bureau against Net 10 for false advertising, and lying about services. I went over the "unlimited" data usage policy 1 time, my data was turned off, and I was rudely connected to a pre-recorded message telling me that since I went over my data could not be restored until my next billing period. I read through the info on the "unlimited" plan, and then paid my next month's bill for my smartphone. I have contacted customer service 3 times about the fact that my data is still not turned on, and they simply say the data should have been restored within 24 hours of paying my new bill. This is horrible on so many levels I do not know where to begin. That, my friends, is the data policy."[15]

"I reactivated my phone on May 17th and had data immediately! The next day, my data is gone! I was told by a Net10 representative that my data had been suspended due to high data usage. How on earth do I lose data in less than 24 hours? …I have been dealing with Net10 since February of this year, and I have had issues every month! I'm purchasing a $50 plan each month and my data runs out after about a week... This isn't fair! They can't help me when I call, and they always transfer me to an automated recording."[16]

"My son's internet capabilities were just shut off for overusage. NOWHERE can I find a limit. $50 card says nothing about a data limit. Now my Son does not have internet to research his homework. This is BALONEY! LET us know when we are approaching limits so we can conserve if we have to. My son is 14 yrs. old and just learning about SMART phones and he is also getting a lesson in SHADY business practices."[17]

61.     Defendant has benefited, and continues to benefit, from falsely advertising that Net10 data plans are "unlimited," terminating or throttling customers' data access to cut costs or to keep Defendant's wireless network carrier partners happy, and relying on confusing, contradictory, and unconscionable Terms and Conditions that Defendant ensures customers will never see or read to justify Defendant's unfair and misleading practices.

62.     Defendant's misrepresentations and omissions regarding Defendant's "unlimited" data plans are material to reasonable consumers.

---

mvAH4&lc=VdFqO9rG-9ioOELYabLal_ag81GKxUvbZcpQm8gZhYc (posted February 2013)
[14] http://net10forum.com/viewtopic.php?f=5782&t=131113 (posted March 28, 2013)
[15] https://www.net10forum.com/viewtopic.php?f=5774&t=201181&start=10#p467601 (posted June 4, 2013)
[16] http://www.consumeraffairs.com/cell_phones/net_10.html?page=2 (posted May 22, 2013)
[17] https://www.net10forum.com/viewtopic.php?f=5774&t=201181&start=10 (posted June 5, 2013)

63. Defendant's continuing practice of terminating and/or throttling customers' data access pursuant to secret data usage caps, or for any other reason, is unfair and is done in bad faith, and defies the reasonable expectations of reasonable customers.

64. Defendant's implementation of a 1.5 GB hard data cap for its AT&T customers, and later a 2.5 GB data cap for all customers, without giving the customers notice of these caps and after having promised them "unlimited data" at the time they purchased their data plans, SIM cards and/or Net10 smartphones, was unfair and was done in bad faith, and defied the reasonable expectations of reasonable customers.

65. Defendant's misrepresentations and practices injured and caused Plaintiffs and Class members to lose money or property in that they purchased expensive smartphones, Net10 SIM cards, and Net10 "unlimited" data plans, but Defendant terminated or throttled the promised "unlimited" data rendering Plaintiffs' and Class members' smartphones essentially useless for their intended purposes.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### *Plaintiff Marisha Johnston*

66. Prior to March 25, 2013, Plaintiff Marisha Johnston had a voice and data plan with Verizon Wireless.

67. Defendant's marketing and advertisements for "unlimited data" displayed in Ms. Johnston's local Kmart store induced Ms. Johnston to switch to Net10. Relying on Defendant's promises, on or about March 25, 2013, Ms. Johnston purchased a Net10 T-Mobile compatible SIM card from Kmart for $15 for use with an unlocked T-Mobile branded LG Android smartphone she received from a friend.

68. Ms. Johnston inserted the SIM card into the smartphone and called Net10 customer service to transfer her phone number and activate her Net10 service. While on the call with a customer service representative, Ms. Johnston purchased Net10's "unlimited" 30-day service plan for $50, and also signed up for Net10's "auto refill" program to automatically renew and pay for her "unlimited" data service each month.

69.     In June 2013, Ms. Johnston received an AT&T compatible Apple iPhone 3GS from her friend. Ms. Johnston called Net10 customer service to switch her plan to the new phone. Ms. Johnston asked if the AT&T iPhone was fully compatible with the Net10 service and whether she would still receive "unlimited" data with the phone. The representative confirmed that with a new AT&T compatible SIM card, Ms. Johnston would receive unlimited data on the iPhone.

70.     After receiving the new SIM card and installing it in her iPhone, Ms. Johnston called Net10 customer service to transfer her phone number to the new SIM card and activate the iPhone.

71.     Defendant did not adequately disclose Net10's Terms and Conditions or Net10's 1.5 GB data cap on AT&T SIM cards during these purchases and activation, and Ms. Johnston was at all times unaware of any such terms.

72.     Ms. Johnston used her smartphone and Net10 data plan to access email, navigate via Google Maps, browse websites, and occasionally watch streaming video. While at home, Ms. Johnston accessed the internet on her phone via Wi-Fi. Ms. Johnston never tethered her phone to a computer to access Net10's data and she never used her phone as a Wi-Fi hotspot.

73.     In mid June, approximately two weeks after Ms. Johnston switched to the AT&T compatible SIM card, Net10 terminated Ms. Johnston's data access without warning. Ms. Johnston called Net10's customer service, and the representative transferred her to the "high data usage hotline" recorded message, which stated she had violated unspecified "Terms and Conditions." Ms. Johnston immediately called back and asked a customer service representative what terms she had violated. The representative transferred Ms. Johnston to someone in another department, who told Ms. Johnston that there was a 1.5 GB data cap on Net10 SIM cards. Ms. Johnston asked why are the Net10 plans being marketed as "unlimited," and told the representative that no one had previously told her there was any such limit. The representative then told Ms. Johnston that he would transfer her to someone who could help her, but he instead transferred her again to the "High Data Usage Hotline" recorded message. Ms. Johnston called

- 18 -                          CLASS ACTION COMPLAINT

1140516.2

back two more times, and each time she was immediately transferred to the same recorded message.

74. Ms. Johnston's data access was restored only on June 23, 2013, when she was automatically charged for a new month of service. However, within two weeks of her data access being restored, Net10 again terminated her data access.

75. Ms. Johnston transferred her service to T-Mobile in August 2013.

76. Ms. Johnston reasonably relied upon Defendant's material misrepresentations and omissions, which, in conjunction with Defendant's acts and practices alleged herein caused Ms. Johnston to suffer harm, injury in fact, and lost money or property. Had Ms. Johnston known that Net10's purportedly "unlimited" plan was in fact limited in the manner that it is, she would not have paid for the Net10 data plan.

### ***Plaintiff Mona Gandhi***

77. Prior to January 2013, Plaintiff Mona Gandhi had a voice and data plan with H2O Wireless which she used with her unlocked Samsung Galaxy Note 2 smartphone.

78. Defendant's marketing and advertisements for "unlimited data" induced Ms. Gandhi to switch to Net10. On or about January 4, 2013, Ms. Gandhi visited a wireless phone dealer in San Francisco who sold Net10 plans. The dealer confirmed to Ms. Gandhi that the Net10 plan included unlimited data, as stated in Net10 advertisements. Relying on Defendant's promises, Ms. Gandhi purchased a Net10 T-Mobile compatible SIM card from the dealer, along with a $50 "unlimited" data plan, paying a total of approximately $70. The dealer installed the SIM card in Ms. Gandhi's smartphone, transferred her phone number to Net10, and activated her service.

79. Ms. Gandhi found T-Mobile coverage in the Hayward area to be inadequate, and purchased a Net10 AT&T SIM card from the same wireless dealer in February 2013 for approximately $20. The dealer installed the new SIM card in Ms. Gandhi's smartphone and transferred Ms. Gandhi's service to the new AT&T SIM card.

-19-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

80.     Ms. Gandhi renewed her monthly service by calling Net10 customer service and purchasing an additional month each time her service plan expired.

81.     In June 2013, Ms. Gandhi purchased an unlocked iPhone 5 on Craigslist. Ms. Gandhi transferred the AT&T SIM card from her Samsung Galaxy Note 2 to the iPhone 5.

82.     Defendant did not adequately disclose Net10's Terms and Conditions during these purchases and activation, and Ms. Gandhi was at all times unaware of any such terms. Moreover, when Defendant imposed a 1.5 GB hard data cap on AT&T SIM card "unlimited" plan customers in March 2013, Defendant failed to inform or notify Ms. Gandhi of this purportedly new policy or of the corresponding revision to the Terms and Conditions.

83.     Ms. Gandhi used her smartphone and Net10 data plan to access email, browse websites, and occasionally navigate via Google Maps. Ms. Gandhi never streamed music or video. Ms. Gandhi never tethered her phone to a computer to access Net10's data and she never used her phone as a WiFi hotspot.

84.     Only July 2, 2013, Ms. Gandhi renewed her monthly service via telephone and signed up for Net10's "auto refill" program to automatically renew her service each month.

85.     Approximately one week later, Net10 terminated Ms. Gandhi's data access without warning. Ms. Gandhi called Net10's customer service, and the representative transferred her to the "High Data Usage Hotline" recorded message. Ms. Gandhi immediately called back and asked why her data service had been terminated. The representative told her that her plan was no longer unlimited, and that her data access would not be restored until she purchased another "unlimited" plan. Ms. Gandhi asked to speak to a supervisor.

86.     The supervisor repeated what the first representative had told her, and informed her that there was now a 1.5 GB data limit on the "unlimited" plan. Ms. Gandhi told the supervisor this did not make sense because she signed up for an "unlimited" data plan and she was never notified that there was a limit. Ms. Gandhi also told the supervisor she did not understand how she could have used 1.5 GB in just a few days given her light usage of data which was limited to checking email and surfing websites. The representative had no response

1140516.2                                          - 20 -                    CLASS ACTION COMPLAINT

and was unable to tell Ms. Gandhi how much data she had used before Net10 terminated her data access. Ms. Gandhi meanwhile had no data access on her phone for the next 3 weeks of July.

87.     Ms. Gandhi transferred her service to Red Pocket Mobile in September 2013.

88.     Ms. Gandhi reasonably relied upon Defendant's material misrepresentations and omissions, which, in conjunction with Defendant's acts and practices alleged herein caused Ms. Gandhi to suffer harm, injury in fact, and lost money or property. Had Ms. Gandhi known that Net10's purportedly "unlimited" plan was in fact limited in the manner that it is, she would not have paid for the Net10 data plan.

### *Plaintiff Marshall Tietje*

89.     Prior to 2007, Plaintiff Marshall Tietje subscribed to various pay-as-you-go cellular plans. Defendant's marketing and advertisements for "unlimited" calls, text and data induced Mr. Tietje to switch to Net10 in or about 2007. Mr. Tietje purchased a Net10 branded Nokia feature phone for use with Net10's "unlimited" plan.

90.     Each month, Mr. Tietje would renew his service by purchasing a Net10 30-day service plan card at a retail store.

91.     On or about July 3, 2013 Mr. Tietje purchased a Net10 branded LG Optimus Dynamic CDMA smartphone for approximately $69 from a local Kmart retail store, along with a $50 Net10 30-day unlimited data plan. Mr. Tietje activated the smartphone and service by calling Net10 customer service.

92.     Defendant did not adequately disclose Net10's Terms and Conditions during these purchases and activations, and Mr. Tietje was at all times unaware of any such terms.

93.     Mr. Tietje used his smartphone and Net10 data plan to access email, browse websites, navigate via Google Maps, and occasionally stream radio. Mr. Tietje never tethered his phone to a computer to access Net10's data and he never used his phone as a WiFi hotspot.

94.     Only July 26, 2013, after only 3 weeks of use of his new smartphone, Net10 terminated Mr. Tietje's data access without warning. Mr. Tietje called Net10's customer service, and the representative told him that his service had been suspended because he had exceeded the

"data limit" and that his data access would not be restored until he paid for the next month of service. Mr. Tietje asked to speak to a supervisor, and the representative said she would do so. But the representative instead transferred him to the "High Data Usage Hotline" recorded message.

95.     Mr. Tietje's data access was restored on August 3, 2013, but he was hesitant to use his data because he feared he would find himself cut off from email and internet again.

96.     Mr. Tietje transferred his service to AT&T Wireless on October 5, 2013.  Because his existing LG Optimus Dynamic was locked to Net10's network, he purchased a new Samsung Galaxy S III smartphone for use on AT&T Wireless.

97.     Mr. Tietje reasonably relied upon Defendant's material misrepresentations and omissions, which, in conjunction with Defendant's acts and practices alleged herein caused Mr. Tietje to suffer harm, injury in fact, and lost money or property.  Had Mr. Tietje known that Net10's purportedly "unlimited" plan was in fact limited in the manner that it is, he would not have purchased his Net10 smartphone or data plan.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this class-action lawsuit on behalf of themselves and the proposed Class members under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

99.     Plaintiffs seek certification of the following Class:

All persons in California who purchased an "unlimited" Net10 wireless service plan and whose data access was terminated or throttled prior to the expiration of the service plan.

Specifically excluded from the Class is the Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

100.    *Numerosity.* Plaintiffs do not know the exact number of Class members but believe that the Class comprises tens of thousands, if not hundreds of thousands, of consumers in California. As such, Class members are so numerous that joinder of all members is impracticable.

1140516.2                                      - 22 -                              CLASS ACTION COMPLAINT

101.    ***Commonality and predominance.*** Well-defined, nearly identical legal or factual questions affect all Class members. These questions predominate over questions that might affect individual Class members. These common questions include, but are not limited to, the following:

a.    Whether Defendant offered to Plaintiffs and Class members "unlimited" data plans;

b.    Whether Plaintiffs and Class members accepted Defendant's offer for "unlimited" data plans;

c.    Whether the Net10 Terms and Conditions were adequately disclosed to and were consented to by Plaintiffs and Class members;

d.    Whether the Net10 Terms and Conditions contain illusory terms;

e.    Whether the Net10 Terms and Conditions contain unconscionable terms;

f.    Whether Defendant breached Defendant's contracts with Plaintiffs and Class members by terminating and/or throttling their data access prior to the expiration of their data plans;

g.    Whether Defendant acted in bad faith or abused Defendant's discretion in terminating or throttling Plaintiffs' and Class members' data access prior to the expiration of their data plans;

h.    Whether Defendant's practice of terminating or throttling Plaintiffs' and Class members' data access went against Plaintiffs' and Class members' objectively reasonable expectations;

i.    Whether Defendant's promise of "unlimited" data was likely to mislead objectively reasonable consumers;

j.    Whether Defendant engaged in deceptive and unfair business and trade practices under California law;

k.    Whether Plaintiffs and Class members are entitled to restitution and other equitable relief;

1140516.2                                - 23 -                    CLASS ACTION COMPLAINT

l.      Whether Plaintiffs and Class members are entitled to damages; and

m.     Whether Defendant should be enjoined from engaging in this type of conduct.

102.    *Typicality.* Plaintiffs' claims are typical of Class members' claims. Plaintiffs and the Class members all sustained injury as a direct result of Defendant's practice of terminating or throttling data access prior to the expiration of their "unlimited" data plans.

103.    *Adequacy.* Plaintiffs will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests, and Plaintiffs have retained counsel that has considerable experience and success in prosecuting complex class-action and consumer-protection cases.

104.    *Superiority.* A class action is the superior method for fairly and efficiently adjudicating this controversy for the following reasons without limitation:

a.      Class members' claims are relatively small compared to the burden and expense required to litigate their claims individually, so it would be impracticable for Class members to seek individual redress for Defendant's illegal and deceptive conduct;

b.      Even if Class members could afford individual litigation, the court system could not. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court; and

c.      Plaintiffs anticipate no unusual difficulties in managing this class action.

## INAPPLICABLE OR UNENFORCEABLE ARBITRATION CLAUSE

105.    Section 16 of the Net10 Terms and Conditions purports to require that certain disputes be individually arbitrated. Section 16 is unenforceable because it is never adequately disclosed or agreed to by consumers, and Defendant does not require consumers who purchase Net10 SIM cards, service plans, or phones to view the arbitration clause before making their purchase. Section 16 is unenforceable because it is unconscionable and/or is against public

policy. Section 16 is substantively unconscionable because, among other reasons, it lacks mutuality in that it purports to require consumers to arbitrate all claims while explicitly permitting Defendant to bring state or federal lawsuits for certain types of claims important to Defendant; it prohibits any damages arising out of the use of or inability to use Net10 data services, and prohibits punitive damages in all circumstances, while specifying $5,000 liquidated damages payable to Defendant by consumers regarding certain types of claims important to Defendant; it requires consumers to bear their own attorneys' fees and costs, even where, as here, the law allows for the prevailing party to be awarded such fees and costs; it requires arbitrations to occur in Miami, Florida regardless of the consumer's state of residence; and it provides that consumers must pay a minimum claim filing fee of $200 per AAA rules effective March 1, 2013. Section 16 is procedurally unconscionable because, among other reasons, it is presented to consumers, if at all, on a take-it-or-leave-it basis and is not conspicuous.

106. Section 16 is not enforceable as to any of Plaintiffs' and Class members' claims because it is illusory, in that Defendant reserves the right to modify or change it at any time without notice to or consent from consumers.

107. Section 16 is not applicable to Plaintiffs' claims for public injunctive relief, because such claims are not arbitrable.

108. To the extent that Defendant asserts that Plaintiffs' and Class members' claims are subject to an arbitration agreement or a class action waiver, Plaintiffs and the Class seek declaratory relief in the form of a finding that such a purported arbitration agreement is void and unenforceable.

## COUNT I
## Breach of Contract

109. Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

110. Defendant offered to Plaintiffs and Class members "unlimited" data plans for use with Net10 SIM cards or Net10 branded and locked smartphones.

1140516.2

CLASS ACTION COMPLAINT

111.    In exchange for Defendant's promise of "unlimited" data plans, Plaintiffs and Class members paid for 30-day service plans, SIM cards, and Net10 branded and locked smartphones.

112.    Plaintiffs and Class members gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed.

113.    Defendant breached Defendant's promise of providing "unlimited" data by terminating or throttling Plaintiffs' and Class members' data access prior to the expiration of their data plans.

114.    The Net10 Terms and Conditions do not form a contract and are not a part of the above-described bargain for lack of mutual assent. Defendant does not (a) adequately disclose the existence of such terms to Plaintiffs or Class members prior to or at the time of the purchase and activation of their Net10 data plans; (b) require Plaintiffs or Class members to acknowledge or assent to the Terms and Conditions; or (c) provide an opportunity for Plaintiffs or Class members to reject the terms in the event that they discover the terms subsequent to the purchase and activation of their data plans. Defendant also does not provide any new consideration in exchange for any subsequent agreement to the Terms and Conditions.

115.    The Net10 Terms and Conditions do not form a contract and are not a part of the above-described bargain because the terms described therein are illusory. Specifically, the Terms and Conditions provide that Net10 may change or modify the terms at any time, in its sole discretion, and without notice to or consent from Plaintiffs or Class members, rendering all of the terms therein illusory.

116.    In the alternative, assuming that the Net10 Terms and Conditions do form part of the basis of the bargain, Sections 2, 7, 8, 10, 16, 17, 18, and 20 of the Terms and Conditions are unconscionable and, therefore, unenforceable.

117.    In the alternative, assuming that the Net10 Terms and Conditions do form part of the basis of the bargain, Sections 3 and 20 of the Terms and Conditions are so contradictory, vague, and ambiguous as to render them meaningless and unenforceable.

118.    Defendant directly benefitted from, and is being unjustly enriched by, Defendant's breach of Defendant's promise to provide "unlimited" data.

119.    As a result of Defendant's breach of Defendant's promise to provide "unlimited" data, Plaintiffs and Class members have been harmed and have suffered damages in an amount to be determined by this Court, including interest on all liquidated sums.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing

120.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

121.    Plaintiffs and Class members bring this claim in the alternative to their Breach of Contract claim.

122.    A covenant of good faith and fair dealing is implied in every contract.

123.    Where a contract vests one party with discretion, but provides no standards for exercising that discretion, the duty of good faith and fair dealing applies and the party exercising the discretion must do so in a commercially reasonable manner or in a manner that satisfies the objectively reasonable expectations of the other party.

124.    Based on Defendant's promises and representations, it was objectively reasonable for Plaintiffs and Class members to expect that Defendant would deliver "unlimited" data access in connection with their data plans.  There exists no objectively reasonable reason to expect that Defendant would have secret data usage limits and terminate or throttle Plaintiffs' and Class members' data access at any time, without warning, and for any or no reason, regardless of the manner in which the data was used.

125.    Defendant abused any discretion Defendant had under the Net10 Terms and Conditions or otherwise by regularly terminating or throttling Plaintiffs' and Class members' promised "unlimited" data access, often without notice, without regard to the manner in which the data was used, and without explanation to Plaintiffs and Class members.

126.    Plaintiffs and Class members performed all required duties, and all conditions required for Defendant's performance occurred.

127.    As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

**COUNT III**
**Unjust Enrichment**

128.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

129.    Plaintiffs and Class members bring this claim in the alternative to their Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing claims.

130.    Defendant knowingly retained a benefit at the expense of Class members, in the form of substantial revenues and payments from Plaintiffs and Class members for Net10 "unlimited" data plans, phones, and SIM cards, from Defendant's conduct in misrepresenting that Defendant's data plans were "unlimited," and regularly terminating or throttling "unlimited" customers' data access.

131.    Plaintiffs' and Class members' detriment and Defendant's enrichment are traceable to, and resulted directly and proximately from, the conduct challenged in this Complaint.

132.    It would be inequitable for Defendant to retain the benefits Defendant received and continues to receive from Plaintiffs and Class members without payment to Plaintiffs and Class members.

133.    Plaintiffs and the Class have no adequate remedy at law.

134.    Plaintiffs seek disgorgement of and/or a constructive trust on all of the inequitable payments and profits Defendant retained from Plaintiffs and Class members.

**COUNT IV**
**Violations of California's Unfair Competition Law**
**California Business & Professions Code § 17200 _et seq._,**

135.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

136.    Section 17200 of the California Business & Professions Code ("UCL") prohibits any "unlawful," "unfair," or "fraudulent" business practice.

137.    Defendant violated the "unlawful" prong of the UCL by making material misrepresentations that Net10 data plans offer "unlimited" data, when in fact Defendant regularly terminates or throttles customers' data access, in violation of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*.

138.    Defendant's practice of regularly terminating or throttling customers' "unlimited" data access, often without notice, violated the "unfair" prong of the UCL because it was immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members. Defendant's practice was also contrary to legislatively declared and public policy and the harm it caused to consumers outweighed its utility, if any.

139.    Defendant violated the "fraudulent" prong of the UCL by making material misrepresentations that Net10 data plans were "unlimited" when they were not, and by failing to disclose and actively concealing material information regarding Defendant's practice of regularly terminating or throttling customers' data access. These material misrepresentations and nondisclosures were likely to mislead consumers.

140.    Plaintiffs relied on Defendant's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, Net10 service plans, compatible phones, or SIM cards had they known the truth.

141.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent conduct, Plaintiffs lost money or property.

142.    Defendant's conduct caused substantial injury to Plaintiffs and Class members. Accordingly, Plaintiffs seek an order enjoining Defendant from committing such unlawful, unfair, and fraudulent business practices, and seek the full amount of money that Plaintiffs and Class members paid for their Net10 service plans, compatible phones, and SIM cards and/or restitutionary disgorgement of profits. Plaintiffs also seek attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

1

2
## COUNT V
### Violations of California's Consumer Legal Remedies Act

3
### California Civil Code §1750 *et seq.*

4
143. Plaintiffs reallege and incorporate by reference every allegation set forth in the

5
preceding paragraphs as though alleged in this Count.

6
144. Defendant is a "person," as defined by Cal. Civ. Code § 1761(c).

7
145. Plaintiffs and the Class members are "consumers," as defined by Cal. Civ. Code

8
§1761(d).

9
146. The service plans, phones, and SIM cards that Defendant marketed and sold

10
constitute "goods" and "services," as defined by Cal. Civ. Code §1761(a) and (b).

11
147. Plaintiffs' and Class members' purchases of Net10 service plans, compatible

12
phones, and SIM cards constitute "transactions," as defined by Cal. Civ. Code § 1761(e).

13
148. Plaintiffs and Class members purchased Net10 service plans, compatible phones,

14
and SIM cards for personal, family, and household purposes as meant by Cal. Civ. Code

15
§ 1761(d).

16
149. Venue is proper under Cal. Civil Code § 1780(d) because a substantial portion of

17
the transactions at issue occurred in this county. Plaintiffs' declarations establishing that this

18
Court has proper venue for this action are attached as Exhibit A.

19
150. Defendant deceived consumers in that Defendant misrepresented that Net10

20
service plans offered "unlimited" data and also failed to disclose or actively concealed that

21
Defendant would regularly terminate or throttle customers' data access.

22
151. Defendant's misrepresentations, active concealment, and failures to disclose

23
violated the CLRA in the following manner:

24
a. Defendant misrepresented that Defendant's Net10 service plans, phones,

25
and SIM cards had characteristics, benefits, or uses that they did not have (Cal. Civ. Code

26
§ 1770(a)(5));

27

28

b.      Defendant misrepresented that Defendant's Net10 service plans, phones, and SIM cards were of a particular standard, quality, and/or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c.      Defendant advertised Net10 service plans, phones, and SIM cards with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

d.      Defendant misrepresented that Net10 service plans, phones, and SIM cards conferred or involved rights, remedies, or obligations that they did not have (Cal. Civ. Code § 1770(a)(14));

e.      Defendant misrepresented that Net10 service plans, phones, and SIM cards were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16));

f.      Defendant inserted unconscionable provisions in the Net10 Terms and Conditions, including Sections 2, 7, 8, 10, 16, 17, 18, and 20 (Cal. Civ. Code § 1770(a)(19)).

152.    Defendant's misrepresentations and nondisclosures regarding Net10 "unlimited" data plans and Defendant's practice of regularly terminating or throttling customers' data access were material to Plaintiffs and Class members because a reasonable person would have considered them important in deciding whether or not to purchase the Net10 service plans, phones, and SIM cards, and because Defendant had a duty to disclose the truth.

153.    Plaintiffs and Class members relied upon Defendant's material misrepresentations and nondisclosures, and had Plaintiffs and Class members known the truth, they would have acted differently.

154.    As a direct and proximate result of Defendant's material misrepresentations and nondisclosures, Plaintiffs and the Class have been irreparably harmed.

155.    On behalf of the Class, Plaintiffs seek injunctive relief in the form of an order enjoining Defendant from making such material misrepresentations and failing to disclose or actively concealing their practice of terminating or throttling data access.  Plaintiffs also seek attorneys' fees and costs.

156.    In accordance with Cal. Civ. Code § 1782(a), on November 13, 2013, Plaintiffs' counsel served Defendant with notice of Defendant's CLRA violations by certified mail, return receipt requested. A true and correct copy of that notice is attached as Exhibit B.

157.    If Defendant fails to provide appropriate relief for Defendant's CLRA violations within 30 days of Plaintiffs' November 13, 2013 notification letter, Plaintiffs will amend this complaint to seek compensatory and exemplary damages as permitted by Cal. Civ. Code §§ 1780 and 1782(b).

**COUNT VI**
**Unconscionability**

158.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

159.    Defendant's practice of offering Net10 "unlimited" data plans while simultaneously purporting to retain the right to arbitrarily and unilaterally terminate or throttle data access at any time and for any reason, with or without warning, is unfair and unconscionable.

160.    Plaintiffs and Class members have no meaningful choice with respect to the Net10 Terms and Conditions or Defendant's unilateral and arbitrary practice of terminating and throttling data access. The Terms and Conditions were not adequately disclosed, if at all, to Plaintiffs and Class members before or during their purchases and activations of Net10 service plans, phones, and SIM cards, and are in any event offered on a take-it-or-leave-it basis. Defendant did not offer Plaintiffs or Class members an opportunity to reject the Net10 terms, and Net10 data plans and SIM cards are non-refundable.

161.    Defendant's purported discretion to terminate or throttle data access is unreasonably favorable to Defendant and unduly harsh with respect to Plaintiffs and the Class, and is therefore substantively unconscionable.

162.    Defendant's enforcement of such unconscionable terms have harmed Plaintiffs and Class members and have caused them to suffer damages in an amount to be determined by this Court, including interest on all liquidated sums.

## PRAYER FOR RELIEF

1.     On behalf of themselves and the Class, Plaintiffs request that the Court order relief and enter judgment against Defendant as follows:

2.     An order certifying Plaintiffs' proposed Class and appointing Plaintiffs and their counsel to represent the Class;

3.     An order that Defendant is permanently enjoined from Defendant's improper conduct and practices as alleged;

4.     A judgment awarding Plaintiffs and Class members restitution, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained as a result of Defendant's unlawful, unfair, and fraudulent business practices and conduct;

5.     A judgment awarding Plaintiffs and Class members actual damages;

6.     A judgment awarding Plaintiffs and Class members exemplary damages for Defendant's knowing, willful, and intentional conduct;

7.     Pre-judgment and post-judgment interest;

8.     Attorneys' fees, expenses, and the costs of this action; and

9.     All other and further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT

1140516.2

Dated: November 14, 2013              Respectfully submitted,

                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


                                      By: _____
                                           Michael W. Sobol

                                      Michael W. Sobol
                                      msobol@lchb.com
                                      Nicole D. Reynolds
                                      nreynolds@lchb.com
                                      LIEFF CABRASER HEIMANN & BERNSTEIN LLP
                                      275 Battery Street, 29th Floor
                                      San Francisco, CA 94111
                                      Telephone: (415) 956-1000

                                      Daniel M. Hattis
                                      dan@hattislaw.com
                                      HATTIS LAW
                                      1134 Crane Street, Suite 216
                                      Menlo Park, CA 94025
                                      Telephone: (650) 980-1990

                                      *Attorneys for Plaintiffs*

1140516.2                             - 34 -                    CLASS ACTION COMPLAINT

# Exhibit A

**Lieff**
**Cabraser**
**Heimann**&
**Bernstein**
Attorneys at Law

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
t  415.956.1000
f  415.956.1008

November 14, 2013

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Frederick J. Pollak, President and CEO
Richard B. Salzman, EVP-General Counsel
TracFone Wireless, Inc.
9700 NW 112 Ave.
Miami, FL 33178

Registered Agent for Service of Process
Corporate Creations Network, Inc.
131-A Stoney Circle, Suite 500
Santa Rosa, CA 95401

Re:  Notice of Violation of California Consumer Legal Remedies Act

Dear Mr. Pollak and Mr. Salzman:

      We represent Marisha Johnston, Mona Gandhi and Marshall Tietje, who purchased
Net10 "unlimited" wireless phone plans.  We send this letter under the California Consumers
Legal Remedies Act, California Civil Code Section 1750 *et seq.* ("CLRA"), to notify TracFone
Wireless, Inc. ("TracFone") that its practice of advertising Net10 plans as providing "unlimited"
data, while also regularly terminating or throttling subscribers' data when consumers exceed
undisclosed data usage limits or arbitrarily at the direction of network carrier partners, violates
the CLRA.  We demand that TracFone rectify its violations within 30 days of receipt of this
letter.

      TracFone misrepresents to consumers that its Net10 wireless phone plans offer
"unlimited" data access and that consumers may use the data access to operate their
smartphones as virtual PCs by browsing the internet, streaming music and videos, or playing
video games.  In reality, TracFone regularly throttles subscribers' data speeds or cuts off access
to data altogether without notice.  TracFone refuses to disclose its data usage caps or explain
under what circumstances it might throttle or terminate data access, making the practice all the
more unclear and deceptive to consumers.

      Moreover, TracFone purports to rely on the Net10 Terms and Conditions of Service when
terminating or throttling subscribers' data, but these terms are never given to or seen by
customers and are riddled with vague, contradictory, unconscionable, and illusory terms.

November 14, 2013
Page 2

Relying on TracFone's promise of "unlimited" data, on March 25, 2013, Marisha Johnston purchased a Net10 SIM card for $15 from a local Kmart store for use with her unlocked LG Android phone. Ms. Johnston also purchased a $50 "unlimited" Net10 data plan, and signed up for Net10's "auto refill" program. In early June 2013, Mr. Johnston upgraded to an Apple iPhone and received a Net10 AT&T compatible SIM card for use with the phone. Two weeks later, Net10 terminated Ms. Johnston's data without warning. Net10 restored Ms. Johnston's data on June 23, 2013, when she was automatically charged for a new month of service. However, within two weeks of her data being restored, Net10 again terminated her data.

Similarly, advertisements for the Net10 "unlimited" data plan induced Mona Gandhi to purchase a Net10 AT&T compatible SIM card from a local Net10 authorized dealer in February 2013 for $20. Ms. Gandhi also purchased a $50 "unlimited" data plan, and signed up for Net10's "auto refill" program. In July 2013, Net10 terminated Ms. Gandhi's data without warning. When Ms. Gandhi called Net10 customer service, she was told that the "unlimited" plan was now capped at 1.5 GB of data, and that her data would not be restored until she purchased another "unlimited" plan.

Net10 advertisements for Net10's "unlimited" data plan likewise induced Marshall Tietje to purchase a Net10 locked CDMA phone for $69 on or about July 3, 2013, from a local Kmart store. Mr. Tietjet also purchased a $50 "unlimited" Net10 data plan. Three weeks later, on July 26, 2013, Net10 terminated Mr. Tietje's data without warning. Net10 informed Mr. Tietje his data would not be restored until his current plan expired on August 3, 2013.

TracFone's material misrepresentations, active concealment, and failures to disclose violated the CLRA in the following manner:

1. TracFone misrepresented that its Net10 phones, SIM cards, and data plans had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

2. TracFone misrepresented that its Net10 phones, SIM cards, and data plans were of a particular standard, quality, and/or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

3. TracFone advertised its Net10 phones, SIM cards, and data plans with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

4. TracFone misrepresented that its Net10 phones, SIM cards, and data plans conferred or involved rights, remedies, or obligations that they did not have (Cal. Civ. Code § 1770(a)(14));

5. TracFone misrepresented that its Net10 phones, SIM cards, and data plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16));

November 14, 2013
Page 3

      6.     TracFone inserted unconscionable provisions in the Net10 Terms and Conditions (Cal. Civ. Code § 1770(a)(19)).

We demand that within thirty (30) days of receiving this letter, TracFone agrees to (1) refrain from engaging in the deceptive practices described above at any time in the future; and (2) return all money Net10 "unlimited" subscribers whose data was terminated or throttled paid for Net10 phones, SIM cards, and/or "unlimited" plans. If TracFone refuses to provide the demanded relief within thirty (30) days, we will seek compensatory and punitive damages, restitution, and any other appropriate equitable relief.

Very truly yours,

Michael W. Sobol

1140580.1
1140580.1

# Exhibit B

1    Michael W. Sobol (State Bar No. 194857)
     Nicole D. Reynolds (State Bar No. 246255)
2    LIEFF CABRASER HEIMANN & BERNSTEIN LLP
     275 Battery Street, 29th Floor
3    San Francisco, CA 94111
     Telephone: (415) 956-1000
4    E-mail: msobol@lchb.com
     nreynolds@lchb.com
5
     Daniel Hattis (State Bar No. 232141)
6    HATTIS LAW
     1134 Crane Street, Suite 216
7    Menlo Park, CA 94025
     Telephone: (650) 980-1990
8    E-mail: dan@hattislaw.com

9    *Attorneys for Plaintiff*

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13

14

15

16

MONA GANDHI, MARISHA JOHNSTON, and MARSHALL TIETJE, individually and on behalf of all others similarly situated,

Plaintiffs,

17

18    v.

19    TRACFONE WIRELESS, INC.

20

Defendant.

Case No. _____

**DECLARATION OF MONA GANDHI**

21

22

23

24

25

26

27

28

I, Mona Gandhi, hereby declare and state as follows:

1.    I am over the age of 18, and a Plaintiff in this action.  The facts contained in this declaration are based on my personal knowledge, and if called upon to do so, I could and would testify competently hereto.

2.    The complaint in this action, filed concurrently with this declaration, is filed in the proper place for trial under California Civil Code § 1780(d), because this is a county in which the Defendant does business and where a substantial portion of the transactions occurred.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on September ___4___ , 2013, in __Hayward____ California.

_____
Mona Gandhi

1　Michael W. Sobol (State Bar No. 194857)
　　Nicole D. Reynolds (State Bar No. 246255)
2　LIEFF CABRASER HEIMANN & BERNSTEIN LLP
　　275 Battery Street, 29th Floor
3　San Francisco, CA 94111
　　Telephone: (415) 956-1000
4　E-mail: msobol@lchb.com
　　nreynolds@lchb.com
5
　　Daniel Hattis (State Bar No. 232141)
6　HATTIS LAW
　　1134 Crane Street, Suite 216
7　Menlo Park, CA 94025
　　Telephone: (650) 980-1990
8　E-mail: dan@hattislaw.com

9　*Attorneys for Plaintiff*

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| MONA GANDHI, MARISHA JOHNSTON, and MARSHALL TIETJE, individually and on behalf of all others similarly situated, | Case No. _____ |
| | **DECLARATION OF MARISHA JOHNSTON** |
| Plaintiffs, | |
| v. | |
| TRACFONE WIRELESS, INC. | |
| Defendant. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Marisha Johnston, hereby declare and state as follows:

1.      I am over the age of 18, and a Plaintiff in this action.  The facts contained in this declaration are based on my personal knowledge, and if called upon to do so, I could and would testify competently hereto.

2.      The complaint in this action, filed concurrently with this declaration, is filed in the proper place for trial under California Civil Code § 1780(d), because this is a county in which the Defendant does business and where a substantial portion of the transactions occurred.


I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on September 5 , 2013, in _____ California.

_____
Marisha Johnston

1 | Michael W. Sobol (State Bar No. 194857)
Nicole D. Reynolds (State Bar No. 246255)
2 | LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery Street, 29th Floor
3 | San Francisco, CA 94111
Telephone: (415) 956-1000
4 | E-mail: msobol@lchb.com
nreynolds@lchb.com
5 |
Daniel Hattis (State Bar No. 232141)
6 | HATTIS LAW
1134 Crane Street, Suite 216
7 | Menlo Park, CA 94025
Telephone: (650) 980-1990
8 | E-mail: dan@hattislaw.com

9 | *Attorneys for Plaintiff*

10 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| MONA GANDHI, MARISHA JOHNSTON, and MARSHALL TIETJE, individually and on behalf of all others similarly situated, | Case No. _____ |
|---|---|
| Plaintiffs, | **DECLARATION OF MARSHALL TIETJE** |
| v. | |
| TRACFONE WIRELESS, INC. | |
| Defendant. | |

I, Marshall Tietje, hereby declare and state as follows:

1.     I am over the age of 18, and a Plaintiff in this action. The facts contained in this declaration are based on my personal knowledge, and if called upon to do so, I could and would testify competently hereto.

2.     The complaint in this action, filed concurrently with this declaration, is filed in the proper place for trial under California Civil Code § 1780(d), because this is a county in which the Defendant does business and where a substantial portion of the transactions occurred.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on September  8  , 2013, in  Big Bear Lake California.

Marshall Tietje

1121998.4

DECLARATION OF MARSHALL TIETJE